J-S20007-25

2025 PA Super 190

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                               :          PENNSYLVANIA
            Appellant          :
                               :
                               :
                               :
            v.                 :
                               :
                               :
                               :
DOMINEEK QUANTAL CARTER        :   No. 1646 MDA 2024

Appeal from the Order Entered November 5, 2024
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0001550-2023

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

OPINION BY OLSON, J.:                    **FILED: AUGUST 29, 2025**

The Commonwealth of Pennsylvania appeals from an order entered on November 5, 2024 which granted, in part, and denied, in part, a motion to suppress filed by Appellee, Domineek Quantal Carter.  Specifically, the Commonwealth contends that the trial court abused its discretion or committed an error of law in finding that Appellee's cellular telephone was subjected to an unlawful search on November 20, 2023 and, further, in excluding evidence obtained from the device as fruit of the poisonous tree. After careful review, we affirm.

The following facts were established during the May 14, 2024 suppression hearing.  In July 2023, the Lycoming County Narcotics Enforcement Unit ("LCNEU") undertook an investigation which involved three controlled purchases of crack cocaine.  The controlled purchases took place on June 26, 2023, June 28, 2023, and July 13, 2023.  During each transaction,

LCNEU observed a confidential informant ("CI") purchase crack cocaine from Appellee at his residence along Green Street in Williamsport, Pennsylvania. Ultimately, on July 14, 2023, LCNEU executed a search warrant for the residence along Green Street. Thereafter, Appellee was arrested and remained in custody until August 24, 2023, when he was released back into the community.

"On or about October 1, 2023, [LCNEU] received intel regarding [a male] selling [crack] cocaine [at a residence along Green Street and] going by the name 'Andy.'" Trial Court Opinion, 11/5/24, at 7 (citation omitted). A CI from an earlier surveillance operation subsequently informed LCNEU that "'Andy' was in fact [Appellee] who was just released on bail from Lycoming County Prison." *Id.* LCNEU, therefore, used a different CI to conduct two additional controlled purchases on November 3, 2023 and November 20, 2023.

The process for each controlled purchase was as follows. The CI contacted an individual named Shana Hill to arrange the purchase of crack cocaine. Initially, Shana Hill met with the CI and, after doing so, proceeded to meet with Appellee. Shana Hill supplied the CI with the requested crack cocaine only after she met with Appellee. Based upon the foregoing, LCNEU applied for a sealed search warrant for Appellee's residence along Green Street on November 20, 2023 (hereinafter, the "First Search Warrant"). The affidavit of probable cause included the facts used to obtain the July 14, 2023, search warrant for the same property, as well as the details of the subsequent controlled purchases that occurred on November 3, 2023 and November 20,

2023. In the application for the search warrant, LCNEU specified that it sought the prerecorded police funds used for the November 20, 2023 controlled purchase.

LCNEU executed the First Search Warrant on November 21, 2023. That same day, LCNEU applied for a second, sealed search warrant for the residence along Green Street (hereinafter, the "Second Search Warrant"). The affidavit of probable cause for the Second Search Warrant also included the "facts used to obtain the July 14, 2023, search warrant for the same property," as well as the details of the controlled purchases that occurred on November 3, 2023 and November 20, 2023. *Id.* at 2. In addition, the affidavit included the following averments prepared by an investigating LCNEU agent:

> On [November 20, 2023, LCNEU] obtained a sealed search warrant[*i.e.,* the First Search Warrant,] for [the residence along] Green St[reet, in the] City of Williamsport for the prerecorded police funds utilized [in earlier investigative operations] on the same day. On [November 21, 2023, LCNEU] executed the search warrant on the above address. The following events occurred.
>
> Entry was made into [the residence along] Green St[reet. Appellee] was hailed to police from his bedroom. [Appellee] exited his bedroom and was removed from the residence pending the search warrant. [Appellee] asked for shoes and a coat to wear and told officers they were in his bedroom. Members of the LCNEU entered [Appellee's] bedroom and immediately observed, in plain view, approximately [50] ripped corner plastic bags (indicative [of] the packaging of crack cocaine and the same type of packaging [as the transaction with the CI on November 20, 2023]) and a tied off bag with marijuana inside located on his dresser.
>
> Inside [Appellee's] bedroom there was an open close[t] type space[ w]ith clothes hanging from a shelf along the west wall of the bedroom. No door separated this space from the sleeping

- 3 -

area of the bedroom. The shelf [with hanging clothes] was . . . attached to the west wall of the bedroom. On top of the shelf in plain view was a safe. Safes are commonly used to store and secure money. Directly next to the safe, on top of the shelf[,] was a ceramic plate containing suspected cocaine powder and a razor blade. This is indicative of cocaine packaging. Drug dealers often use a plate and razor blade to cut and divide the cooked crack cocaine and make it ready for weighing and packaging. I personally have observed this same type of system in hundreds of houses w[h]ere crack cocaine dealers were operating their illegal enterprise from.

I believe that a further search of [Appellee's] residence will produce crack cocaine that [Appellee] is stashing at his residence in furtherance of his illegal cocaine enterprise. I know that it is common for drug dealers to keep their product and proceeds from their sales within their base of operations. I have personally seized and been a part of hundreds of search warrants where illegal proceeds w[ere] located with the product being sold, *i.e.*[,] crack cocaine, powder cocaine, heroin, fentanyl, methamphetamine and numerous opiate pills both prescription and counterfeit.

Hanging on the door of [Appellee's] bedroom was a green [] jacket. This is the same jacket [Appellee] was wearing on [November 20, 2023,] when he met Shana Hill[, the individual that delivered the crack cocaine to the CI during the November controlled purchases]. Also in [Appellee's] room was a cell[ular tele]phone with a [textual message (commonly referred to as a "text message")] openly visibl[e] [(*i.e.*, illuminated)] on the front screen that read,

> "Shana .6h
> Alright they bouta [*sic*] be here. They dr. . . ."

The phone was not manipulated in anyway and that partial [text] message was just observed by looking at the [cellular tele]phone where it lay. I know that Shana is Shana Hill[,] the same unwitting informant used [during the November controlled purchases]. (See attached picture).

N.T. Suppression Hearing, 5/14/24, at 3 (Commonwealth's Exhibit 2) (unnecessary capitalization omitted) (paragraph break inserted). Like the

First Search Warrant, the Second Search Warrant also targeted the residence along Green Street and sought recovery of the following: cocaine and cocaine paraphernalia; illegal cocaine proceeds including United States Currency; Appellee's green jacket; and Appellee's cellular telephone. *See id.* The Second Search Warrant was executed sometime before November 23, 2023.[1]

Following execution of the Second Search Warrant and the seizure of various contraband, together with Appellee's cellular telephone, Appellee was charged with one count of manufacture, delivery, or possession with intent to deliver a controlled substance.[2] On March 12, 2024 Appellee filed an omnibus pre-trial motion seeking, *inter alia*, to suppress evidence recovered by LCNEU. In his motion, Appellee first pointed out that the affidavits of probable cause supporting both the First and Second Search Warrants included information from the controlled purchases that occurred on June 26, 2023, June 28, 2023, and July 13, 2023. In Appellee's view, the June and July controlled purchases constituted "stale information" and, as such, "should not have been used to support the application[s for either the First Search Warrant or the Second Search Warrant]." Appellee's Omnibus Pre-Trial Motion, 3/12/24 at 5 and 6. Appellee, therefore, asked the trial court to suppress "evidence found within the residence [along] Green Street due to [the] invalid search warrant[s]."

---

[1] It is unclear when the Second Search Warrant was executed but, by its terms, it needed to be served no later than November 23, 2023. *See* N.T. Suppression Hearing, 5/14/24, at 3 (Commonwealth's Exhibit 2).

[2] 35 P.S. § 780-113(a)(30).

*Id.* at 7.  In addition, Appellee claimed that neither the First Search Warrant nor the Second Search Warrant were supported by probable cause.  *See id.* at 10 (claiming that the warrants "lacked a description of the property and where the door on the property was located.").

Finally, Appellee took issue with LCNEU's seizure of his cellular telephone during the execution of the Second Search Warrant.  In developing this claim, Appellee cited the affidavit of probable cause supporting the Second Search Warrant, in which LCNEU averred that, during the execution of the First Search Warrant, LCNEU investigators saw Appellee's cellular telephone "openly visibl[e] on the front screen" with a text message from Shana Hill, the same unwitting informant used during the control purchases on November 3, 2023 and November 20, 2023.  N.T. Suppression Hearing, 5/14/24, at 3 (Commonwealth's Exhibit 2).  Appellee claimed that, by viewing his cellular telephone, LCNEU conducted an unlawful search of its contents in violation of his constitutional rights.[3]  Therefore, Appellee asked the trial court to suppress evidence obtained from LCNEU's warrantless search and subsequent seizure of his cellular telephone, as well as any evidence derived from Appellee's cellular telephone, as fruit of the poisonous tree.

A suppression hearing was held on May 14, 2024.  The Commonwealth did not present any testimony.  Instead, the Commonwealth introduced into

---

[3] As will be discussed *infra*, Appellee's counsel also suggested at the suppression hearing that LCNEU manipulated Appellee's cellular telephone as the incriminating text message from Shana Hill was not readily apparent to LCNEU.  *See* N.T. Suppression Hearing, 5/14/24, at 21-22.

evidence the First Search Warrant, the Second Search Warrant, as well as the picture LCNEU took of Appellee's cellular telephone during the execution of the First Search Warrant. **See id.** at 2-3 and 19. Per the Commonwealth, the picture depicted "exactly what [LCNEU] saw," which included "the portion of the text" when the "[cellular tele]phone [was] locked."[4] **Id.** at 18.

At the hearing, the trial court requested argument on Appellee's claim that LCNEU's inspection of his cellular telephone, as averred in the affidavit of probable cause supporting the Second Search Warrant, was illegal and, therefore, evidence of his cellular telephone and its contents were subject to suppression. Appellee's counsel stated:

> So, based on the search of the home, after the November 20[th] search warrant was executed, [LCNEU] found a cell[ular tele]phone that they read, openly visible on the front screen, a text message from Shana [Hill], six hours ago, ["]all right, they bouta [sic] be here, dot, dot, dot. You can [not] read the rest.
>
> It [is] settled law in Pennsylvania that there [is] no difference between viewing the internal and external screens of a cell[ular tele]phone compared to a call log. A search of a cell[ular tele]phone, even if minimally [intrusive], requires a warrant if you get any information from a cell[ular tele]phone. Even if it

---

[4] The Commonwealth did not include its exhibit depicting the photograph of Appellee's cellular telephone in the certified record on appeal. "It is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the [certified appellate] record in [the] case." **Eichman v. McKeon**, 824 A.2d 305, 316 (Pa. Super. 2003) (citation omitted). Indeed, it is equally settled that it "is the responsibility of the appellant to provide a complete record to the appellate court on appeal" and that any "document which is not part of the official certified record is considered to be non-existent." **Id.** (citation omitted). Due to the Commonwealth's failure, we are precluded from reviewing the picture ourselves and are bound by the suppression court's description thereof.

[is] lit up, looking at it, . . . reading the front screen . . . and a text message would be considered a search [which requires a warrant].

There is a categorical rule prohibiting police from looking for any information on a cell[ular tele]phone without a warrant. A search occurs when police intrude upon a constitutionally protected area without the individual's explicit or implicit permission. A cell[ular tele]phone is inherently personal, it [is] protected by *Commonwealth v. Fulton*[,179 A.3d 475, 487 (Pa. 2018)]. And . . . to constitute an intrusion, it does [not] have to be some great, big act or [obtain] personal information of great value. Even a small, seemingly insignificant . . . act . . . can constitute a search [which requires authorization pursuant to a warrant].

So we would argue that the search of the [cellular tele]phone and the use of that information . . . to get the [Second Search Warrant] . . . to look into the [cellular tele]phone further and any information found in the [cellular tele]phone should be suppressed as fruit of the poisonous tree.

*Id.* at 14-15 (emphasis added).

Thereafter, the Commonwealth made the following argument:

First of all, [because LCNEU was in Appellee's residence pursuant to the First Search Warrant], they were justified in being where they were at the time when they saw the screen light up. There was no manipulation of this [cellular tele]phone. What happened in actuality is this is plain view for the instance of them physically seeing with their eyes that the [cellular tele]phone lit up and that there was a partial message on the screen. The [cellular tele]phone was never touched. Once they saw that, obviously they could see . . . they [are] not required to close their eyes because a [cellular tele]phone lights up and they can see that a text [message] came in from the person they just watched do a drug deal with [Appellee].

\*\*\*

So, number one, [LCNEU did not search Appellee's cellular telephone]. There was no intrusion on any privacy interest because this was something they viewed in plain view and in order to [later] search [Appellee's cellular telephone, LCNEU]

obtained the [Second Search Warrant]. No search was done. They were already in a place they were lawfully allowed to be. … [Again, n]obody touched this [cellular tele]phone. They saw it light up and got a search warrant for it based on what they saw on the screen when it lit up by itself, which as we all [know,] that [is] what happens when a [cellular tele]phone gets a notification, it lights up.

***

So[,] the fact that the [cellular tele]phone went off in front of [LCNEU] was not search, it was not an intrusion of any privacy interest . . . and it was a basis for getting the [Second Search Warrant].

*Id.* at 16-21. Hence, the Commonwealth claimed that, even though LCNEU did not seize Appellee's cellular telephone during the execution of the First Search Warrant, the observations of LCNEU investigators were constitutionally permissible under the plain view exception and furnished probable cause to support Second Search Warrant.

Finally, Appellee's counsel offered a brief response, stating:

I would like to touch base on a couple of things. First, while it may seem unreasonable, I believe that the way the case law says, that monitoring the . . . external screen, you would need to look away from the screen. I think reading the text message is a search and that going a [step] further[, LCNEU] took a photo[graph].

Additionally, we do [not] have testimony from the officer who took the photo[graph] but, as Commonwealth stated, a phone lights up when it gets a notification. The notifications on the screen [of Appellee's cellular telephone were from] six hours [before LCNEU executed the First Search Warrant] and then there [is] another mobile services notification from 15 hours [before]. So [cellular tele]phones do [not] usually just light up. Usually waving your hand or lifting it to your face [makes a cellular telephone] light [] up. I doubt that the screen would be lit all the time. So something must have happened for the

- 9 -

phone to light up if there [is] no other notifications on the screen.

*Id.* at 21-22.

Ultimately, on June 24, 2022, the trial court denied Appellee's motion, in part, and granted Appellee's motion, in part. Trial Court Opinion and Order, 11/5/24, at 18. More specifically, the trial court concluded that, contrary to Appellee's claims, the affidavits in support of the First Search Warrant and the Second Search Warrant did not contain stale information. Rather, "a fair reading of the affidavit[s] convey[ed] that the information from the June and July [] 2023 controlled buys was used to corroborate the information from the November [] 2023 controlled buys." *Id.* at 10. Because the affidavits included information explaining that LCNEU "conduct[ed] additional surveillance and controlled buy procedures," the trial court denied Appellee's claim for suppression on this basis. *Id.* The trial court further concluded that the First Search Warrant was supported by probable cause. *Id.* at 12 and 18.

The trial court next considered Appellee's claim that LCNEU's inspection of his cellular telephone during the execution of the First Search Warrant was impermissible and, as such, LCNEU's seizure of the device pursuant to the Second Search Warrant was improper. Initially, the trial court recognized that, "in recent opinions, the [United States] Supreme Court has expanded its definition of 'constitutionally protected areas' to include cell[ular tele]phones." *Id.* at 13, *citing Riley v. California and United States v. Wurie*, 573 U.S. 373 (2014) (hereinafter, "*Riley/Wurie*"). More specifically, the High Court

in **Riley/Wurie** determined that individuals have a subjective expectation of privacy in their cellular telephones and that such an expectation is reasonable. **See Riley/Wurie**, **supra** at 403 ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]'") (citation omitted). Thus, the trial court herein determined that "even a small, seemingly insignificant act of information gathering by police is a search" and, as such, unlawful unless made pursuant to a warrant or an exception to the Fourth Amendment's warrant requirement. Trial Court Opinion and Order, 11/5/23, at 13, *citing* **Fulton**, **supra**. Accordingly, the trial court held that LCNEU conducted a warrantless search of Appellee's cellular telephone when agents viewed the text message from Shana Hill and photographed the screen of Appellee's mobile device while executing the First Search Warrant.

The trial court then went on to address the Commonwealth's claim that LCNEU's inspection and subsequent seizure of Appellee's cellular telephone was nonetheless constitutionally permissible because the text message that appeared spontaneously on Appellee's cellular telephone was in plain view and immediately understood to be incriminating, as alleged in in the affidavit of probable cause attached to the Second Search Warrant. Ultimately, the trial court rejected the Commonwealth's claim that the agents' "plain view" observations established probable cause to support the Second Search Warrant. Trial Court Opinion and Order, 11/5/23, at 15-16. More specifically, the trial court stated:

> [Appellee] avers that[,] while the cell[ular tele]phone was in plain view, the likelihood that the [cellular tele]phone's screen spontaneously [self-]activated is slim. [Appellee] argue[d] that a spontaneous activation of the cell[ular tele]phone [was] suspect considering the most recent notification preced[ed] the search by approximately six [] hours.

*Id*.

Based upon all of the foregoing, the trial court held that LCNEU's inspection of Appellee's cellular telephone during the execution of the First Search Warrant constituted an unlawful search. Moreover, the trial court determined that the averments on which the Commonwealth relied to establish that LCNEU investigators observed incriminating messages in plain view on Appellee's mobile device were unworthy of belief. The trial court therefore suppressed "the evidence obtained from [Appellee's] cell[ular tele]phone as fruit of the poisonous tree." *Id.* at 16.

On November 6, 2024, the Commonwealth filed a timely notice of appeal from the trial court's November 5, 2024, interlocutory order that suppressed the cellular telephone's contents. Within its appeal, the Commonwealth properly certified that the order "terminates or substantially handicaps the prosecution." Commonwealth's Notice of Appeal, 11/6/24, at 1; **see also** Pa.R.A.P. 311(d).[5] On November 15, 2024, the trial court ordered the

---

[5] "Certification of pretrial appeals by the Commonwealth [under Pennsylvania Rule of Appellate Procedure 311(d)] is an exception to the requirement that appeals may be taken only from final orders." **Commonwealth v. Cosnek**, 836 A.2d 871, 873 (Pa. 2003). As our Supreme Court has explained, "[w]hen a pretrial motion removes evidence from the Commonwealth's case, only the
*(Footnote Continued Next Page)*

Commonwealth to file a concise statement of errors complained of appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth timely complied.

The Commonwealth raises the following issues on appeal:

1. Whether the trial court abused its discretion in determining that an unlawful search was conducted upon [Appellee's] cell[ular tele]phone?

2. Whether the trial court abused its discretion when it suppressed evidence related to [Appellee's] cell[ular tele]phone as fruit of the poisonous tree?

Commonwealth's Brief at 9.

On appeal, the Commonwealth challenges the trial court's suppression ruling. When reviewing a challenge to a suppression ruling, our standard of review is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the [defense] prevailed before the suppression court, we may consider only the evidence of the [defense] and so much of the evidence for the [Commonwealth] as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty

---

prosecutor can judge whether that evidence substantially handicaps his ability to prove every essential element of his case. Additionally, only the prosecutor can judge whether he can meet his constitutional burden of proving his case without that evidence." *Id.* at 875 (citations omitted). In following, the Supreme Court has held that the Commonwealth may utilize Rule 311(d) to immediately appeal "a pretrial ruling [that] results in the suppression, preclusion or exclusion of Commonwealth evidence." *Id.* at 877.

it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted and formatting altered).

Initially, the Commonwealth claims that the trial court erred in determining that the act of viewing Appellee's cellular telephone during the execution of the First Search Warrant constituted a search. More specifically, the Commonwealth "adamantly avers that the subject cell[ular tele]phone has never been searched. In regard to what took place on November 21, 2023, surrounding the subject cell[ular tele]phone, the Commonwealth avers, and the law supports, that [LCNEU's action did not rise to the level of] a search at all." Commonwealth's Brief at 19. Based upon our review of relevant case law promulgated by the United States Supreme Court, as well as our Supreme Court, we disagree.

In 2014, the United States Supreme Court addressed whether, without a warrant, law enforcement could search digital information contained on a cellular telephone incident to a lawful arrest. ***See Riley/Wurie***, ***supra***. Initially, the High Court recognized that cellular telephones are, in essence, "minicomputers" that "place vast quantities of personal information literally in the hands of individuals" and that, if it permitted law enforcement to conduct a search of its contents following an arrest, it would essentially provide "police officers unbridled discretion to rummage at will among a person's private effects." ***Id.*** at 393 and 399 (citation omitted); ***see also id.*** at 396

- 14 -

(explaining that the search of a cellular telephone "would typically expose to the government far more than the most exhaustive search of a house[.]") (emphasis omitted). Thus, **Riley/Wurie** provided the following "answer" to "the question of what police must do before searching a cell[ular tele]phone seized incident to an arrest[:] get a warrant." **Id.** at 403.

Four years later, our Supreme Court interpreted **Riley/Wurie** in **Fulton**, **supra**. In so doing, the **Fulton** Court initially recognized that, pursuant to **Riley/Wurie**, "an individual [maintains an] expectation of privacy [] in [his or her] cell[ular tele]phone . . . not in each and every piece of information stored therein." **Fulton**, 179 A.3d at 487. Hence, "in the absence of an applicable exception, **any search** of a cell[ular tele]phone requires a warrant." **Id.** (emphasis in original). The **Fulton** Court further noted that "a search occurs when police intrude upon a constitutionally protected area [(*i.e.*, a cellular telephone)] without the individual's explicit or implicit permission." **Id.** at 487-488. Importantly, the **Fulton** Court cautioned that the governmental intrusion "need not uncover something 'of great personal value'" because "even a small, seemingly insignificant act of information gathering by police in a constitutionally protected area is a search." **Id.**, *citing* **Arizona v. Hicks**, 480 U.S. 321, 325 (1987) ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable."). Based upon the foregoing, the **Fulton** Court determined that the following police conduct constituted a search: (1) powering on a cellular telephone; (2) navigating "through the menus of [a cellular telephone] to obtain its number;" and

(3) monitoring a cellular telephone's "incoming calls and text messages." **Fulton**, 179 A.3d at 488-489. The **Fulton** Court, like **Riley/Wurie**, concluded its review by instructing law enforcement that, if they "wish[] to obtain information from a cell[ular tele]phone, get a warrant." **Id.** at 489.

Upon review of the foregoing, we cannot agree with the Commonwealth's assertion that LCNEU did not search Appellee's cellular telephone during the execution of the First Search Warrant. To the contrary, LCNEU admitted in the affidavit of probable cause supporting the Second Search Warrant that they viewed Appellee's cellular telephone, read a message from Shana Hill, and then took a photograph of Appellee's mobile device. The **Fulton** Court explicitly noted that these types of actions, while arguably minimally invasive, constitute intrusions upon constitutionally protected spaces. **See Fulton**, 179 A.3d at 489 (explaining that "monitoring a [cellular tele]phone's incoming text messages allows the viewer to see the content of a text message, which indisputably constitutes private data. This is all information that, pursuant to **Riley/Wurie**, cannot be accessed by police without a warrant.").[6]

_____

[1] In **Riley/Wurie**, the United States Supreme Court broadly directed law enforcement to obtain a warrant in order to access information on a cellular telephone. This sentiment was echoed strongly in **Fulton**. In both cases, however, the Courts "left open the possibility that 'case-specific exceptions' (e.g. consent or exigent circumstances) could justify the search of a particular [cellular tele]phone." **Fulton**, 179 A.3d at n.18, _citing_ **Riley/Wurie**, 573 U.S. at 402-403. In light of the aforementioned language, subsequent courts have upheld warrantless searches of cellular telephones when conducted pursuant
_(Footnote Continued Next Page)_

We now turn to the Commonwealth's claim that, even if the act of viewing Appellee's cellular telephone constituted a search, LCNEU's actions were constitutionally permissible under the plain view doctrine. To support its argument, the Commonwealth maintains that LCNEU did not manipulate Appellee's cellular telephone. Instead, as averred in the affidavit of probable cause supporting the Second Search Warrant, LCNEU entered Appellee's bedroom pursuant to a search warrant and saw the cellular telephone "openly visibl[e]" to the lock screen displaying an incriminating text message from Shana Hill. N.T. Suppression Hearing, 5/14/24, at 3 (Commonwealth's Exhibit 2). The Commonwealth, therefore, argues that the trial court erred in holding that LCNEU unlawfully searched Appellee's cellular telephone. We disagree.

This Court previously stated:

> [t]he plain view doctrine applies if 1) police did not violate the Fourth Amendment during the course of their arrival at the location where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the incriminating nature of the item was readily apparent; and 4) police had the lawful right to access the item.

---

to a valid exception to the Fourth Amendment warrant requirement. **See Alasaad v. Mayorkas**, 988 F.3d 8 (1st Cir. 2021) (holding that the "border search" exception allowed a basic, routine search of a cellular telephone at the United States' border); **United States v. Cano**, 934 F.3d 1002, 1018-1019 (9th Cir. 2019) (accord); **see also Sinclair v. State**, 118 A.3d 872, 888 (Md. App. Ct. 2015) (holding that law enforcement's inspection and photograph of the "screen saver image" on the defendant's cellular telephone was permissible under the plain view doctrine).

***Commonwealth v. Anderson***, 40 A.3d 1245, 1248 (Pa. Super. 2012) (citation omitted).[7]

Herein, the trial court held that the plain view doctrine was inapplicable. More specifically, the trial court recognized that, generally speaking, a cellular telephone does not "spontaneously activate" and, instead, illuminates when a notification is published. Trial Court Opinion, 11/5/24, at 15. The trial court also recognized that the "most recent notification" on Appellee's cellular telephone "preceded the search by approximately six [] hours." ***Id.*** On this basis, the trial court flatly rejected the Commonwealth's contention that the incriminating nature of Appellee's cellular telephone, *i.e.*, the text message from Shana Hill, was readily apparent and in plain view without manipulation. Instead, the trial court ostensibly concluded that LCNEU, in some way, manipulated Appellee's cellular telephone to reveal the text message from Shana Hill and, as such, the plain view doctrine did not operate to justify the warrantless search of Appellee's cellular telephone. ***See Commonwealth v. Wright***, 99 A.3d 565, 568-569 (Pa. Super. 2014) (holding: "the Commonwealth failed to establish that the incriminating nature of [the

_____

[7] Ordinarily, the plain view doctrine is cited to support the immediate seizure of contraband observed by law enforcement personnel from a lawful vantage point. ***See Commonwealth v. Hall***, 305 A.3d 1026, 1035 (Pa. Super. 2023) (holding that law enforcement entered the abandon vehicle to assist potentially injured occupants and, as such, validly observed a firearm, marijuana and a cellular telephone in plain view. Thus, law enforcement were able to seize the aforementioned evidence under the plain view doctrine). Here, however, LCNEU did not immediately seize Appellee's mobile device but, instead, incorporated their "plain view" observations into the affidavit of probable cause attached to the Second Search Warrant.

a]ppellee's cell[ular tele]phone was immediately apparent" and that "the plain view doctrine [did not] justif[y] the warrantless seizure of [the a]ppellee's cell[ular tele]phone.")  As will be discussed *infra*, there is nothing within the certified record that enables this Court to determine that, in so doing, the trial court abused its discretion.

On appeal, the Commonwealth challenges the trial court's authority to question the veracity of an averment in the affidavit supporting the Second Search Warrant, *i.e.*, the affiant's statement that LCNEU did not manipulate Appellee's cellular telephone to reveal the text message from Shana Hill.  In support, the Commonwealth claims that Appellee's suppression motion only challenged the  "four corners" of the affidavit in support of the Second Search Warrant.  Citing Pa.R.Crim.P. 203(D), the Commonwealth maintains that it could only present, and the trial court could only consider, the affidavit of probable cause supporting the Second Search Warrant to determine whether there was sufficient probable cause to secure a search warrant for Appellee's cellular telephone.  Contrary to the procedural rules, the Commonwealth contends that the trial court conducted an improper *de novo* review and made an impermissible credibility determination regarding the accuracy of the affiant's averment that Appellee's cellular telephone illuminated without any handling to reveal the partial message from Shana Hill which, in turn, nullified the applicability of the plain view doctrine.  Because the Commonwealth mischaracterizes Appellee's suppression claim, we disagree.

Rule 203 of the Pennsylvania Rules of Criminal Procedure states, in relevant part, as follows.

> (B) No search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority in person or using advanced communication technology. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.
>
> * * *
>
> (D) At any hearing on a motion for the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (B).

Pa.R.Crim.P. 203(B), (D). Undoubtedly, the rule "plainly states" that the suppression court, in reviewing a magistrate's probable cause determination, "may only consider the affidavit." ***Commonwealth v. James***, 69 A.3d 180, 187 (Pa. 2013). "The rule does not speak, however, to the evidence the suppression court may consider when a defendant challenges veracity or omissions of facts in the affidavit," which a defendant has the right to do. ***Id.***; ***see also Commonwealth v. Hall***, 302 A.2d 342, 344 (Pa. 1973) (holding that a defendant at a suppression hearing may "test the truthfulness of the recitals in the warrant" and that, to "rule otherwise[] would permit police in every case to exaggerate or expand on the facts given to the magistrate merely for the purpose of meeting the probable cause requirement"). If a defendant lodges such a challenge, our case law demands that it "must be

resolved with evidence beyond the affidavit's four corners." ***James***, 69 A.3d at 190.

In contrast to the Commonwealth's claims, Appellee herein did not merely challenge the sufficiency of the affidavits of probable cause supporting the First and Second Search Warrants in his suppression motion. Instead, Appellee lodged a specific challenge against the veracity of the affiant's statement that Appellee's cellular telephone was "lit" with "a '[text message] openly visibl[e] on the front screen'" displaying a message from Shana Hill. Appellee's Omnibus Pre-Trial Motion, 3/12,24 at 7. This specific challenge was reiterated at the May 14, 2024 suppression hearing wherein Appellee's counsel claimed that "something must have happened for the [cellular tele]phone to light up" given the fact that the text message from Shana Hill was received approximately six hours before LCNEU executed the First Search Warrant and viewed Appellee's cellular telephone. N.T. Suppression Hearing, 5/14/24, at 22. As indicated ***supra***, Appellee's challenge was legally permissible.[8] ***See James***, 69 A.3d at 188 ("This Court has held a defendant at a suppression hearing has the right to test the veracity of the facts recited in the affidavit in support of probable cause."). We therefore disagree with the contention that Rule 203 prohibited the Commonwealth and, in turn, the trial court, from

---

[8] Appellee's challenge was made pursuant to ***Franks v. Delaware***, 438 U.S. 154 (1978). In contrast to the Commonwealth's claims on appeal, Appellee's challenge, as lodged within his motion to suppress and expressed during the suppression hearing, was sufficiently specific.

resolving Appellee's challenge with evidence beyond the four corners of the affidavit in support of the Second Search Warrant.

Our view of Appellee's suppression challenge, as well as the trial court's review thereof, finds support in our Supreme Court's decision in **James**, **supra**, the facts of which are as follows. On April 11, 2007, police received information regarding a possible drug transaction at Darrell James's residence. On April 13, 2007, police "search[ed] the garbage at [James's] residence and discovered drug paraphernalia, as well as marijuana and cocaine residue." **James**, 69 A.3d at 181. Then, on April 19, 2007, "police conducted a second trash pull of [James's] garbage and discovered more drug paraphernalia and residue." **Id.** Based upon the foregoing, as well as other evidence obtained through a CI, the police applied for a warrant to search James's residence. The affidavit of probable cause supporting the search warrant stated as follows:

> On [April 13, 2007, members of the police ] . . . conducted a trash pull of [James's residence]. Upon searching the **garbage taken from the residence**[, the police] did recover "diapers" which are sandwich baggies with the corners torn off of them. [Approximately] 20 of the baggie "diapers" were found inside an empty plastic sandwich baggie box. Also found was one plastic baggie with marijuana stems and seeds inside of it, [approximately three] plastic baggie "knots[,]" 10 plastic baggie "corners" and [one] plastic baggie with cocaine residue inside it. The plastic baggie residue was field tested using the Narcopouch 904B which tested positive for the presence of cocaine.
>
> * * *
>
> On [April 19, 2007, members of the police ] . . . conducted a final trash pull of [James's residence]. Upon searching the

- 22 -

> ***garbage taken from the residence***[, the police] did recover
> [approximately 10] "diapers" which are plastic baggies with the
> corners torn off, [two] plastic baggies with marijuana residue,
> one plastic baggie knot and a plastic corner of a baggie with
> cocaine residue.  The plastic baggie corner was field tested
> using a NarcoPouch 904B which tested positive for the presence
> of cocaine. Indicia of residency was located in said trash[.]

*Id.* at 181–182 (emphasis in original).

Thereafter, James filed a motion to suppress, seeking to suppress*, inter alia*, evidence seized from his residence following the execution of the aforementioned search warrant.  In so doing, James claimed that the affidavit in support of the search warrant failed to establish probable cause.  James specifically argued that, because the affidavit "did not specify where the trash was actually located when police seized it," there was a distinct possibility that the police searched the trash on his porch, thereby violating his Fourth Amendment rights.  *Id.* at 182.  After initially granting James's motion, the trial court granted the Commonwealth's motion for reconsideration because

> it determined there were two constitutional issues: one involved
> the search warrant itself, and the other involved the trash pull.
> Because there was no way to tell from the affidavit of probable
> cause and the prior proceedings whether the trash pull violated
> [James's] Fourth Amendment rights, the trial court allowed the
> Commonwealth to present evidence pertaining to the trash pull
> that was not within the four corners of the affidavit.

*Id.* The Commonwealth, therefore, called the officer who conducted the trash pull to testify.  He specified that the "trash had been set out on the sidewalk adjoining the steps leading to [James's] residence on trash collection day." *Id.* Based upon the foregoing, the trial court determined that the trash was

abandoned and the trash pull was lawful. James appealed, arguing that, pursuant to Pa.R.Crim.P. 203(D), the "'four corners rule'" prohibited the trial court from considering "evidence outside the four corners of the affidavit in determining the constitutional validity of the trash pull." *Id.*

The Supreme Court disagreed. First, the *James* Court determined that James's suppression claim, which included a "specific challenge . . . concern[ing] the legality of the trash pulls" was "quite distinct from a challenge to the existence of probable cause within the four corners of the affidavit." *Id.* at 189-190. Hence, despite James's objection, evidence "beyond the affidavit's four corners" was necessary to resolve his challenge to the constitutionality of the trash pulls. *Id.* at 190. More specifically, the High Court explained:

> [W]hen a fact in an affidavit is specifically challenged (as opposed to a generic, global challenge to the affidavit's sufficiency), the Commonwealth must come forward with evidence elucidating the validity of the fact in question. The affidavit alone is not enough; when its facts are challenged, evidence concerning how those facts were ascertained is often required. Live witnesses subject to cross-examination—in this case, one of the officers who conducted the trash pull—were essential for the trial court to determine whether the initial warrantless search was lawful and could remain among the facts it considered when assessing probable cause.

*Id.*; *see also Commonwealth v. (William) Ryan*, 407 A.2d 1345, 1348 (Pa. Super. 1973) ("While the court could not venture outside the four corners of the affidavit in deciding whether probable cause existed, it is still the Commonwealth's burden to prove the validity of the statements contained in

the affidavit and this can only be done by real, live witnesses who are subject to cross-examination by the defendant."). Based upon the foregoing, the ***James*** Court determined that the trial court correctly considered the officer's testimony in assessing the constitutionality of the trash pulls, and that, based upon the officer's assertions, the trial court correctly determined that the search warrant was based upon probable cause.

Like the defendant in ***James***, Appellee claimed that the affiant's statement that Appellee's cellular telephone was illuminated to reveal the text message from Shana Hill, without manipulation, was unworthy of belief in assessing probable cause. In light of Appellee's specific claim, the Commonwealth was required to "come forward with evidence elucidating the validity of the fact in question," *i.e.*, whether the affiant did, in fact, view Appellee's cellular telephone with the message from Shana Hill in plain view or whether Appellee's cellular telephone was touched, moved, or otherwise manipulated to illuminate the message. ***James***, 69 A.3d at 190. The Commonwealth was also entitled to call technical experts familiar with cellular telephone features and settings. These individuals could identify features and/or settings that would have explained the process by which a notification illuminates on a mobile device and, in turn, provide a technical pathway that would explain the observation LCNEU claimed to have made to buttress the veracity of the averments in the affidavit of probable cause supporting the Second Search Warrant. The Commonwealth failed to do so and, instead, the Commonwealth simply relied upon the affidavit of probable cause in support

- 25 -

of the Second Search Warrant, as well as the picture LCNEU took of Appellee's cellular telephone (which was incorporated in the affidavit). Pursuant to ***James*** and ***(William) Ryan***, the Commonwealth's failure to set forth additional evidence – live testimony – was patently insufficient to sustain its "burden to prove the validity of the statements contained in the affidavit." ***James***, 69 A.3d at 189, *citing **(William) Ryan, supra,*** at 1348. Thus, in our view, the Commonwealth cannot, now on appeal, cite its failure as a basis for precluding the trial court from second-guessing the truthfulness of the averments set forth in the affidavit of probable cause. Such a result is contrary to our case law.

In view of all of the foregoing, we cannot say that, in suppressing Appellee's cellular telephone, as well as any evidence subsequently obtained from it, the trial court committed an error of law. As discussed ***supra***, the trial court correctly held that the act of viewing, reading and photographing Appellee's cellular telephone constituted a search. ***See Fulton***, 179 A.3d at 489. The trial court then properly perceived Appellee's suppression claim to be a challenge to the veracity of the affiant's claim that, during the execution of the First Search Warrant, LCNEU did not manipulate Appellee's mobile device to reveal the text message from Shana Hill. Finally, the trial court considered, based upon the evidence submitted by the Commonwealth, whether the claim that Appellee's cellular telephone either spontaneously lit up or was continuously illuminated to be credible. Having determined that such an averment was unworthy of credit, the trial court correctly held that

the Commonwealth could not use the plain view doctrine – which requires that the evidence's incriminating nature be immediately apparent - to justify the act of viewing and photographing Appellee's cellular telephone. We therefore hold that the trial court properly held that evidence of Appellee's cellular telephone was subject to suppression and that any evidence subsequently obtained from a search of its contents constituted fruit of the poisonous tree. *See Commonwealth v. Shabezz*, 166 A.3d 278, 290 (Pa. 2017) ("Evidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by 'exploitation' of the illegality[.]"), *citing* *Wong Sun v. United States*, 371 U.S. 471 (1963).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/29/2025